UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

Descart Austin Begay, Jr.,

        Defendant.

Case No. 21-cr-119 (NEB/LIB)

**ORDER AND
REPORT AND RECOMMENDATION**

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon the parties' various Motions for the discovery and production of evidence, [Docket No. 16, 18, 19, 20, 21, 22, 23, 24, 25, 38], as well as, Defendant Descart Austin Begay, Jr.'s ("Defendant") Motion to Suppress Statements, [Docket No. 26]; and his Motion to Suppress Tribal Court Plea Agreement. [Docket No. 27]. The Court held a Motions Hearing on September 8, 2021, and September 14, 2021, regarding the parties' pretrial motions.[1]

For the reasons discussed herein, the Government's Motion for Discovery, [Docket No. 16]; Defendant's Motion to Retain Rough Notes, [Docket No. 18]; Defendant's Motion for Disclosure of 404(b) "Bad Acts" Evidence, [Docket No. 20]; Defendant's Motion for Release of Brady Materials, [Docket No. 23]; and Defendant's Motion for Discovery and Inspection, [Docket No. 25], are **GRANTED**. Defendant's Motion to Compel Production of Giglio Material, [Docket No. 19], is **GRANTED**, in part, and **DENIED** without prejudice, in part. Defendant's Motion for Pretrial Disclosure of Jencks Act Materials, [Docket No. 22]; and his Motion to Compel

---

[1] Based on the representations of the parties at the September 8, 2021, Motions Hearing and for the reasons stated on the record, Defendant's Motion for Disclosure of Confidential Reliable Informants, [Docket No. 21], as well as, his Motion for Disclosure of Grand Jury Transcripts, [Docket No. 24], were termed as moot. (Minute Entry, [Docket No. 58]).

Production of Communications Among Members of the Prosecution Team, [Docket No. 38], are **DENIED**.

Further, it is recommended that Defendant's Motion to Suppress Statements, [Docket No. 26], be **DENIED**; and Defendant's Motion to Suppress Tribal Court Plea Agreement, [Docket No. 27], be **DENIED**.

## I.    Background

Defendant is charged with one (1) count of aggravated sexual abuse in violation of 18 U.S.C. §§ 2241(a), 1151, and 1153(a), as well as, one (1) count of sexual abuse in violation of 18 U.S.C. §§ 2242(1), 1151, and 1153(a). (Indictment, [Docket No. 1]).

## II.    Government's Motion for Discovery. [Docket No. 16].

The Government seeks discovery pursuant to Rules 16(b), 12.1, 12.2, 12.3, and 26.2 of the Federal Rules of Criminal Procedure, as well as, Rules 702, 703, and 705 of the Federal Rules of Evidence. (See Gov't's Mot. for Discovery, [Docket No. 16]).

### A.  Inspection and Copying Pursuant to Rule 16(b)

#### 1.  Documents and Tangible Objects

The Government requests that the Court order Defendant to permit inspection and copying of all books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of Defendant and which Defendant intends to introduce as evidence in his case-in-chief at trial.

Defendant did not object to the request. The motion is granted, and Defendant shall disclose any such responsive materials no later than fourteen (14) days before trial.

#### 2.  Reports of Examinations and Tests

The Government further requests all results and reports of physical or mental examinations and of scientific tests or experiments made in connection with the above captioned matter, or

copies thereof, within the possession or control of Defendant, which Defendant intends to introduce as evidence in his case-in-chief at trial or which were prepared by a witness whom Defendant intends to call at trial.

Defendant did not object to the request. The motion is granted, and Defendant shall disclose any such responsive materials no later than fourteen (14) days before trial.

### 3.  Expert Testimony

The Government also seeks a written summary of expert testimony Defendant intends to use under Rule 702, 703, and 705 of the Federal Rules of Evidence as evidence at trial. The Government asserts that the summary must describe the opinions of the expert witnesses, the basis and reasons therefore, and the witnesses' qualifications.

Defendant did not object to the request. The motion is granted, and Defendant shall disclose any such responsive materials for experts he intends to call in his case-in-chief at trial no later than seven (7) days before trial.

### B.  Notice of Alibi Defense

Pursuant to Federal Rule of Criminal Procedure 12.1, the Government seeks an Order from the Court requiring Defendant, if he intends to claim alibi as a defense, to state the specific place or places at which Defendant claims to have been at the time of the alleged offenses in the above captioned matter and the names and addresses of the witnesses upon whom Defendant intends to rely to establish such alibi.

Defendant did not object to this request. The motion is granted, and Defendant shall give notice of same pursuant to Rule 12.1 as soon as practicable and in no event later than twenty-one (21) days before trial.

**C.  Notice of Insanity/Mental Illness Defense**

In addition, pursuant to Federal Rule of Criminal Procedure 12.2, the Government requests the Court to order Defendant, if he intends to rely upon the defense of insanity or introduce expert testimony relating to a mental disease or defect or any other mental condition of Defendant relevant to the issue of guilt, to provide the Government notice of such defense.

Defendant did not object to this request. The motion is granted, and Defendant shall give notice of same pursuant to Rule 12.2 as soon as practicable and in no event later than twenty-one (21) days before trial.

**D.  Notice of Public Authority Defense**

Furthermore, pursuant Federal Rule of Criminal Procedure 12.3, the Government seeks an Order from the Court requiring Defendant, if he intends to rely upon the defense of actual or believed exercise of public authority, to notify the Government of the agency involved and the time during which Defendant claims to have acted with public authority.

Defendant did not object to this request. The motion is granted, and Defendant shall give notice of same pursuant to Federal Rule of Criminal Procedure 12.3 as soon as practicable and in no event later than twenty-one (21) days before trial.

**G.  Witness Statements**

The Government seeks all statements within Defendant's possession or control of any witness that Defendant intends to call in connection with a suppression hearing, detention hearing, trial, or sentencing.

Defendant did not object to this request. The motion is granted. To the extent Defendant has statements in his possession or control of any witness that he intends to call to testify in connection with a suppression hearing, detention hearing, trial, or sentencing, Defendant shall

disclose such statements to the Government no later than three (3) business days before such witness is called to testify.

### III.    Defendant's Motion to Retain Rough Notes. [Docket No. 18].

Defendant requests an Order from the Court requiring any law enforcement agent to retain and preserve all rough notes taken as part of their investigations, whether or not the contents of such rough notes are incorporated in official records. (See Def's Mot. for Retention of Rough Notes, [Docket No. 18]).

The Government does not object to Defendant's request for the retention of rough notes.

Defendant's Motion is granted regarding rough notes as to retention only at this time.  If Defendant seeks production or disclosure of rough notes, he will need to bring a separate motion for such production.

### IV.    Defendant's Motion to Compel Production of Giglio Material, [Docket No. 19], and for Disclosure of Evidence Favorable to Defendant, [Docket No. 23].

Defendant seeks disclosure of evidence favorable to him which would fall within the authority of Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and their progeny. (Def.'s Mot. for Disclosure of Evid. Favorable to Def. [Docket No. 19]; Def.'s Mot. to Compel Production of Giglio Material, [Docket No. 22]).

The Government, acknowledging its duty to disclose responsive materials and information, represented that it has previously disclosed evidence favorable to the Defendant within its possession and will continue to comply with its obligations under Brady, Giglio, and their progeny. (Gov't's Pre-Hearing Response to Def.'s Pretrial Mots., [Docket No. 29], at pp. 3-4).

Defendant's motion seeking disclosure of evidence favorable to him which would fall within the authority of Brady, Giglio, and their progeny is granted.  The Government will disclose any and all remaining and/or subsequently discovered, obtained, or obtainable material responsive

to <u>Brady</u> to the Defense as soon as said responsive materials are discovered by the Government.[2] The Government will disclose materials which are responsive to <u>Giglio</u> and related to the impeachment of the Government's witnesses to be called at trial no later than seven (7) days before trial, or when ordered by the trial judge to disclose trial witnesses, whichever is earlier.

Defendant also seeks an Order of this Court to compel documents and information related to the investigation of "'lead case agent'" FBI Special Agent Montgomery's ("SA Montgomery") misconduct from an unrelated case that bear on his credibility. (Def.'s Mot. to Compel Production of <u>Giglio</u> Material, [Docket No. 19]).  Insofar as Defendant seeks to compel misconduct information related to SA Montgomery, the Government objects to the extent that it goes beyond the requirements of <u>Brady</u>, <u>Giglio</u>, and their progeny and the Federal Rules of Criminal Procedure.

Under <u>Brady</u>, <u>Giglio</u>, and their progeny, "prosecutors have a duty to disclose to the defense all material evidence favorable to the accused, including impeachment and exculpatory evidence." <u>United States v. Wright</u>, 866 F.3d 899, 908 (8th Cir. 2017). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Jeanpierre</u>, 636 F.3d 416, 422 (8th Cir. 2011).

The Court first considers whether SA Montgomery's personnel files and disciplinary records must be produced by the Government as impeachment material.  Defendant contends that, despite the Government's representation that SA Montgomery will not call him as a witness at any

---

[2] The Court notes that in <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), the United States Supreme Court "emphasized the discretion of the *prosecutor*, not the trial judge, in deciding what evidence is producible under <u>Brady</u>." <u>United States v. Garrett</u>, 238 F.3d 293, 304 n.4 (5th Cir. 2000) (emphasis added). The Sixth Circuit has also explained that "while the <u>Brady</u> rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure." <u>United States v. Clark</u>, 957 F.2d 248, 251 (6th Cir. 1992). That being said, "[i]f [the Government] fails to comply adequately with a discovery order requiring it to disclose <u>Brady</u> material, it acts at its own peril." <u>Id.</u> Accordingly, the Court encourages the Government to carefully evaluate the materials in its possession in light of a liberal understanding of its <u>Brady</u> obligations.

hearing or trial, SA Montgomery's role as "lead case agent" in the prosecution necessitates disclosure of documents and information that bear on his "credibility" and may be used to impeached him because Defendant may nevertheless subpoena SA Montgomery to testify at trial regarding the Government's investigation.  (See Def.'s Mot. to Compel Production of Giglio Material, [Docket No. 19], at p. 2).

As already noted, the Government is obligated to seek and disclose "not only exculpatory evidence, but also evidence that might be valuable in impeaching government witnesses." United States v. Pou, 953 F.2d 363, 366 (8th Cir. 1992). "However, this obligation only applies to testifying officers." Bastidas v. City of Los Angeles, No. 04-8902-GAF (AJW), 2006 WL 4749706, at *7 (C.D. Cal. Feb. 22, 2006); see also United States v. Brown, No. 1:19-CR-222 EAW (MJR), 2020 WL 2028538, at *6 (W.D.N.Y. Apr. 28, 2020) (finding the Government was not obligated to produce impeachment material where "the Government maintain[ed] it d[id] not intend to call [a DEA Special Agent] as a witness"); United States v. McGinnist, No. 4:18CR00269 ERW/NCC, 2020 WL 1921703, at *5 (E.D. Mo. Apr. 20, 2020) (noting that "the government is only obligated to disclose impeachment information relating to a government witness" and finding that "the government may not be compelled under Brady or Giglio to produce impeachment material" for an involved police officer who was a defense witness); cf., United States v. Haskell, 468 F.3d 1064, 1075 (8th Cir. 2006) (finding that undisclosed impeachment evidence regarding a witness who did not testify at trial was "not material because the government's case would have been the same even had the defense had access to the undisclosed information"); United States v. Green, 178 F.3d 1099, 1109 (10th Cir. 1999) (citation omitted) ("[B]ecause both the discovery order and Giglio apply only to impeachment information relating to a government witness they are inapplicable because the government did not ever call [a confidential informant] as a witness.").

Accordingly, based on the Government's representation that it will not call SA Montgomery as a trial witness, the Government is not required to produce SA Montgomery's personnel files and disciplinary records as impeachment material at this time. Nevertheless, "[s]hould this position change and [SA Montgomery] be named as a government witness, the Government would be obligated to produce all relevant impeachment or Giglio material." See, e.g., Brown, 2020 WL 2028538, at *6.

Having established that SA Montgomery's personnel files and disciplinary records need not be produced at this time as impeachment materials, the Court next considers whether they must be produced by the Government as exculpatory material. Defendant contends that because the subject of SA Montgomery's "personal investigation occurred while he investigated Defendant, the Court should order the Government to produce documents and information related to the investigation of his misconduct." (See Def.'s Mot. to Compel Production of Giglio Material, [Docket No. 19], at p. 2). The Court construes Defendant's argument as asserting that although SA Montgomery's misconduct did not occur in connection with the present case, it is nonetheless exculpatory Brady material because the investigation into his misconduct occurred while SA Montgomery was the lead investigator in this case thereby implicating the propriety of his investigation here.

Circumstances similar to those now before the Court were recently considered in United States v. Brown. No. 1:19-CR-222 EAW (MJR), 2020 WL 2028538, at *6–7 (W.D.N.Y. Apr. 28, 2020). Specifically, the court in Brown considered whether the personnel files of the lead DEA Special Agent which contained information related to his alleged misconduct in connection with other criminal cases were exculpatory. Id. The court noted that evidence the lead agent had engaged in misconduct in the course of investigating that specific case would require disclosure because it would be directly relevant to the propriety and integrity of that particular investigation.

Id. at *7. However, the court found that "information that [the DEA Special Agent] engaged in misconduct or criminal activity during his investigation of other criminal cases is neither favorable to [the defendant] nor material to his guilt." Id.

This Court finds Brown persuasive. The record presently before this Court indicates that the personnel investigation of SA Montgomery is unrelated to the present case. There are no allegations in the present record of any misconduct by SA Montgomery in connection with his investigation of this case. Therefore, this Court finds on the present record that evidence of SA Montgomery's possible misconduct in an unrelated matter is not exculpatory in the present case. See Id. Defendant's mere speculation that SA Montgomery's personnel files and disciplinary records may contain exculpatory material simply because he engaged in unrelated misconduct in a different case while he was also the lead investigator in this case are not sufficient to require production, nor to require an in-camera review. See, e.g., United States v. Van Brocklin, 115 F.3d 587, 594 (8th Cir. 1997); Pou, 953 F.2d at 366–67.

Accordingly, the Government is not required to produce SA Montgomery's personnel files and disciplinary records as exculpatory material at this time.

Therefore, to the extent Defendant's Motion to Compel Production of Giglio Material, [Docket No. 19], seeks SA Montgomery's personnel files and disciplinary records, it is denied without prejudice.

## V.    Defendant's Motion for Disclosure of 404(b) "Bad Acts" Evidence. [Docket No. 20].

Defendant seeks disclosure of any "bad act" or "similar course of conduct" evidence that the Government intends to offer at trial pursuant to Federal Rule of Evidence 404(b). (See Def.'s Mot. for Disclosure of 404(b) Evidence, [Docket No. 20]). Defendant further seeks the purpose for which the Government will offer said evidence. (Id.). Defendant seeks such disclosures at least four (4) weeks before trial. (Id.).

In its written response, the Government suggested that disclosures regarding Rule 404(b) evidence be made no later than two (2) weeks before trial.

In relevant part, Rule 404(b)(3) provides that the Government must "provide reasonable notice of any" Rule 404(b) "evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it." Fed. R. Evid. 404(b)(3)(A). In that notice, the Government must also "articulate . . . the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B).

Defendant's Motion for Disclosure of Rule 404(b) Evidence, [Docket No. 20], is granted, as set forth herein. The Court orders the Government to disclose to the Defense as soon as practicable, and in no event later than fourteen (14) days before trial, formal notice of any specific 404(b) evidence it intends to offer, as well as, the purpose for which it intends to offer it into evidence at trial.[3]

## VI.    Defendant's Motion for Pretrial Disclosure of Jencks Act Material. [Docket No. 22].

Defendant moves the Court for an Order requiring the Government to disclose Jencks Act materials at least two weeks before trial. (See Def.'s Mot. for Early Disclosure of Jencks Act Material, [Docket No. 22]).

The Government objects to Defendant's motion arguing that it cannot be required to make pretrial disclosure of Jencks Act materials.

The Court recognizes the practical effect that disclosing Jencks Act materials only after a witness has actually testified in the Government's case-in-chief creates the prospect for unnecessary continuances and delays in the trial while the Defense is permitted a reasonable time

---

[3] Federal Rule of Evidence 404(b) does not extend to evidence of acts which are "intrinsic" to the charged offense. United States v. Adediran, 26 F.3d 61, 63 (8th Cir. 1994) (standards applicable to evidence considered under Rule 404(b) do not apply to such "inextricably intertwined" evidence); see United States v. Williams, 900 F.2d 823 (5th Cir. 1990).

to review the late disclosures. However, Defendant provides no citation to authority which would allow the Court to <u>require</u> early disclosure of Jencks Act material. Generally, the case law provides that the Court may not require the Government to make early disclosure of Jencks Act material. <u>See, e.g.</u>, <u>United States v. Alexander</u>, 736 F. Supp. 968, 981 (D. Minn. 1990); <u>United States v. White</u>, 750 F.2d 726, 727 (8th Cir. 1984); <u>United States v. Wilson</u>, 102 F.3d 968, 971–72 (8th Cir. 1996).

Accordingly, Defendant's Motion for Early Disclosure of Jencks Act Material, [Docket No. 22], is denied.[4]

## VII.    Defendant's Motion for Discovery and Inspection. [Docket No. 25].

Defendant seeks disclosure of any written, recorded, or oral statements made by Defendant or copies thereof in the possession, custody, or control of the Government, as well as, a copy of his criminal history. (<u>See</u> Def.'s Mot. for Discovery, [Docket No. 25]).  Furthermore, Defendant requests permission to inspect and/or copy books, papers, documents, photographs, and tangible objects in the possession, custody, or control of the Government and which are material to the preparation of the defense or are intended for use by the Government as evidence in chief at the trial or were obtained from or belonged to the Defendant.

Defendant also requests permission to inspect and copy the results of any physical or mental examinations or scientific tests or experiments. Pursuant to Rule 16(a)(1)(G), Defendant requests written summaries of any expert opinion the Government intends to use in its case-in-chief, including expert witnesses' qualifications and opinions, as well as, the basis for those opinions.

---

[4] Nevertheless, in its written response, the Government voluntarily agreed to provide all Jencks Act material to the Defense by no later than two (2) weeks before trial. The Court encourages such voluntarily agreements.

In its written response to Defendant's Motions, the Government asserted that it had already disclosed substantial materials pursuant to Rule 16, and it would continue to comply with its obligations under Rule 16.

Defendant's Motion for Discovery and Inspection, [Docket No. 25], is granted as to any subsequently acquired materials or information which are specifically responsive to Rule 16, which shall be disclosed to the Defense as soon as said responsive materials are discovered by the Government and in any event by no later than fourteen (14) days before trial, except with respect to expert disclosures, which shall be disclosed as soon as practicable and in any event by no later than twenty-one (21) days before trial.

## VIII. Defendant's Motion to Compel Production of Communications Among Members of the Prosecution Team. [Docket No. 38].

Defendant seeks an Order of this Court "compel[ling] the Government to produce the "communications among members of the Prosecution Team, including the U.S. Attorney's Office, Federal Bureau of Investigation (hereinafter "FBI"), and the Red Lake Nation (including the police department and prosecutor's office), related to their joint investigation of Defendant's case." (Def.'s Mot. to Compel Production of Communications Among Members of the Prosecution Team, [Docket No. 38]).

### A. Statement of Relevant Facts[5]

On July 3, 2020, the Red Lake Police Department arrested Defendant for allegedly sexually assaulting a woman on the Red Lake Indian Reservation where Defendant and the woman lived. (Def.'s Ex. 1, at p. 1).[6] On July 6, 2020, Special Agent Justin Montgomery ("SA Montgomery")

---

[5] The facts contained in this section are derived from the testimony of Red Lake Criminal Investigator Garrett Dietman at the September 8, 2021, Motions Hearings, as well as, the Government and Defendant's exhibits presented in the present case.

[6] Defendant's Exhibit 1 is an interview report of the victim prepared by FBI Special Agent Justin Montgomery. At the September 14, 2021, Motions Hearing, Defendant, without objection, offered the interview report into evidence as Defendant's Exhibit 1. (Tr. 18).

and Red Lake Police Department Criminal Investigator Garrett Dietman ("CI Dietman") interviewed Defendant at the Red Lake Detention Center where Defendant was being held. (Tr. 53; Def.'s Ex. 4; Def.'s Ex. 23).[7] At the conclusion of the interview, Defendant consented to a DNA swab and was instructed to, among other things, sign the FBI Consent to Search Form. (Gov't's Ex. 3).[8] On July 9, 2020, Defendant appeared in the Red Lake Tribal Court for an arraignment with his defense attorney where a "not guilty" plea was entered, and bail conditions were argued. (Def.'s Ex. 20).[9] Defendant was ordered to be held at the Red Lake Detention Center until the next hearing. (Gov't's Ex. 5, at 1:18-4:00).[10] Defendant subsequently appeared for a pre-trial hearing at Red Lake Tribal Court on August 6, 2020 where he was ordered to remain at the Red Lake Detention Center. (Gov't's Ex. 6, at 1:23-2:30).[11]

On November 16, 2020, the Minnesota Bureau of Criminal Apprehension (BCA) submitted a pending DNA report status to SA Montgomery wherein several items would be forensically examined against a known DNA sample collection kit. (Gov't's Ex. 8, at p. 2).[12] On

[7] Defendant's Exhibit 4 is an interview report of Defendant prepared by FBI Special Agent Justin Montgomery. At the September 14, 2021, Motions Hearing, Defendant, without objection, offered the interview report into evidence as Defendant's Exhibit 4. (Tr. 19). Defendant's Exhibit 23 is a memorandum of Defendant's interview prepared by Criminal Investigator Garrett Dietman. At the September 8, 2021, Motions Hearing, Defendant, without objection, offered the memorandum into evidence as Defendant's Exhibit 23. (Tr. 78-79).

[8] Government's Exhibit 3 is an FBI consent to search form. At the September 8, 2021, Motions Hearing, the Government, without objection, offered the FBI consent to search form into evidence as Government's Exhibit 3. (Tr. 65).

[9] Defendant's Exhibit 20 is a chart summary of the three hearings from the Red Lake Tribal Court. At the September 8, 2021, Motions hearing, Defendant, without objection, offered the summary into evidence as Defendant's Exhibit 20. (Tr. 89).

[10] Government's Exhibit 5 is a thumb drive containing the audio recording of Defendant's July 9, 2020, arraignment in Red Lake Tribal Court. At the September 14, 2021, Motions Hearing, the thumb drive audio recording was admitted into evidence as Government's Exhibit 5, without objection. (Tr. 4). The citations to the audio recordings are in a MM:SS format.

[11] Government's Exhibit 6 is a thumb drive containing the audio recording of Defendant's August 6, 2020, pre-trial hearing in Red Lake Tribal Court. At the September 14, 2021, Motions Hearing, the thumb drive audio recording was admitted into evidence as Government's Exhibit 6, without objection. (Tr. 4). The citations to the audio recordings are in a MM:SS format.

[12] Government's Exhibit 8 are Minnesota Bureau of Criminal Apprehension ("BCA") DNA reports dated October 12, 2020, November 16, 2020, January 27, 2021, and February 16, 2021. At the September 14, 2021, Motions Hearing, the Government, without objection, offered the BCA DNA report into evidence as Government's Exhibit 8. (Tr. 26).

January 27, 2021, the BCA submitted a second pending DNA report status to SA Montgomery. (Id. at p. 5).

The record indicates that, on February 8, 2021, Defendant and the Red Lake Nation Prosecutor signed a "Proposed Plea Agreement," which provided, among other things, that Defendant was agreeing to enter into a plea of guilty to the charges of: "aggravated sexual assault 508.07(a) and breaking and entering 509.08."[13]  (Gov't's Ex. 4).[14]  Defendant subsequently appeared at a change of plea hearing in Red Lake Tribal Court with his defense attorney on February 12, 2021, wherein the Tribal Court Judge signed the "Proposed Plea Agreement" and Defendant was ordered to, among other things, "be committed to 365 days in jail" and was "credit[ed with] time served." (Gov't's. Ex. 4; Def.'s Ex. 20).

Approximately five days later, on February 17, 2021, CI Dietman submitted a letter to a Red Lake Tribal Judge requesting a criminal history record check for Defendant.  (Gov't's Ex. 12).[15]  The letter provided that "[t]he Red Lake Department of Public Safety/Criminal Investigation Division and the FBI [were] conducting an investigation involving [Defendant]." (Id.).  CI Dietman testified at the September 8, 2021, Motions hearing that this letter was a "generic form that [he] utilized to get a criminal history check on [Defendant]" at the request of either SA Montgomery or FBI Special Agent Ryan Nilson.  (Tr. 82, 86).

On March 15, 2021, the BCA submitted a final DNA report to SA Montgomery with DNA results.  (Gov't's Ex. 8, at p. 10).  On May 20, 2021, a federal grand jury indicted Defendant with

---

[13] It appears that Defendant signed the "Proposed Plea Agreement" twice—once on the signature block for "Counsel for Descart Begay," and a second time on the signature block for "Descart Begay, Defendant."  (See Gov't's Ex. 4).

[14] Government's Exhibit 4 is a copy of Defendant's tribal court plea agreement.  At the September 8, 2021, Motions Hearing, the Government, without objection, offered the tribal court plea agreement into evidence as Government's Exhibit 4.  (Tr. 68).

[15] Defendant's Exhibit 12 is a criminal history record check request prepared by Red Lake Criminal Investigator Garrett Dietman.  At the September 8, 2021, Motions Hearing, Defendant, without objection, offered the criminal history record check request into evidence as Defendant's Exhibit 12.  (Tr. 83).

two counts of aggravated sexual abuse and sexual abuse in violation of 18 U.S.C. §§ 2241(a), 2242(1), 1151, and 1153(a).  (Indictment, [Docket No. 1]).

### B.  Standard of Review

Federal Rule of Criminal Procedure 16 states that the government must permit the defendant to inspect and copy documents if the documents are "within the government's possession, custody, or control" and are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E).  Evidence is material under Rule 16 if it is "helpful to the defense," United States v. Vue, 13 F.3d 1206, 1208 (8th Cir. 1994), and "enables a defendant significantly to alter the quantum of proof in his or her favor," United States v. Baker, 453 F.3d 419, 425 (7th Cir. 2006).  The defendant bears the burden of showing materiality under Rule 16. United States v. Jean, 891 F.3d 712, 715 (8th Cir. 2018); Vue, 13 F.3d at 1208.

Under Brady and its progeny, the prosecution has a duty to disclose evidence favorable to an accused, and the failure to disclose such evidence violates due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Strickler v. Greene, 527 U.S. 263, 280 (1999) (quoting Brady, 373 U.S. at 87).  In Strickler, the Court also set out the three elements of a true Brady violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. Strickler, 527 U.S. 263, 119 S.Ct. 1936

### C.  Analysis

Defendant argues that he is entitled to access any communications between the FBI or the U.S. Attorney's Office and the Red Lake law enforcement to explore the "apparent coordination between the Red Lake Nation Tribal Government and the federal Government" because discovery produced so far suggests that the Red Lake law enforcement and the Government "worked hand-

in-glove to secure Defendant's Tribal guilty plea." (Def's Mot. to Compel Production of Communications Among Members of the Prosecution Team, [Docket No. 38], at pp. 3-4).

Defendant's argument here is unpersuasive. Under Federal Rule of Criminal Procedure 16, a showing of materiality requires more than "a mere conclusory allegation" of the requested information's materiality. United States v. Krauth, 769 F.2d 473, 476 (8th Cir. 1985) (discussing predecessor Rule 16(a)(1)(C)) (citation omitted); see also United States v. Mandel, 914 F.2d 1215, 1219 (9th Cir. 1990) ("Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense.").

Here, Defendant's mere speculative or conclusory allegations that a suspected "hand-in-glove" relationship existed between Red Lake law enforcement and the federal government does not justify a blanket authorization to inspect all of the communications between the so-called "prosecution team" under either Brady and its progeny, nor under Rule 16.  Indeed, Defendant fails to point to any factual evidence in the record that the Government utilized Red Lake law enforcement as a "mere tool" to prosecute Defendant.  From interviewing Defendant at the Red Lake Detention Center to requesting Defendant's criminal history record check, the record presently before the Court merely highlights typical, routine cooperation between Red Lake law enforcement and the FBI.   See United States v. Williams, 104 F.3d 213, 216 (8th Cir. 1997) (noting that both the Supreme Court, in Bartkus v. Illinois, 359 U.S. at 123, and the Eighth Circuit, in United States v. Talley, 16 F.3d at 974, "specifically recognized that cooperation between state and federal authorities does not amount to unlawful collusion.").

Furthermore, the uncontested sequence of events undermines any argument that the timing of the FBI's investigation suggests misconduct.  While Defendant was held by the Red Lake Tribal Court, the record before the Court demonstrates that the FBI investigation remained very much

16

active—DNA reports were being generated by the BCA and sent to SA Montgomery in November 2020, January 2021, and February 2021. And once the final BCA report in March 2021, confirmed Defendant's DNA against the sample collected in July 2020, the Government only then moved forward with seeking Defendant's indictment of two counts of aggravated sexual abuse and sexual abuse. Defendant's motion is merely speculative and fails to make the requisite showing of materiality under Brady or Rule 16.

Therefore, Defendant's Motion to Compel Production of Communications Among Members of the Prosecution Team, [Docket No. 38], is denied.

**IX.    Defendant's Motion to Suppress Statements. [Docket No. 26].**

Defendant moves the Court for an Order suppressing the statements made to SA Montgomery and CI Dietman during the July 6, 2020, interview conducted while Defendant was in custody at the Red Lake Detention Center.

**A.  Statement of Facts**[16]

As previously provided, supra, the record presently before the Court indicates that, on July 3, 2020, the Red Lake Police Department arrested Defendant for allegedly sexually assaulting a woman on the Red Lake Indian Reservation where Defendant and the woman lived. (Def.'s Ex. 1, at p. 1). On July 6, 2020, SA Montgomery and Red Lake Police Department Criminal Investigator Garrett Dietman ("CI Dietman") interviewed Defendant. (Tr. 53; Def.'s Ex. 4; Def.'s Ex. 23). At the time of the interview, Defendant was in custody at the Red Lake Detention Center. (Def.'s Ex. 4; see also Def.'s Exs. 4, 23). When Defendant entered the visitation room, there was some non-recorded initial conversation where SA Montgomery and CI Dietman introduced themselves, informed Defendant why they were there, and what Defendant was being charged with. (Tr. 59).

---

[16] The facts contained in this section are derived from the testimony of Red Lake Criminal Investigator Garrett Dietman and Special Agent Ryan Nilson with the Federal Bureau of Investigation at the September 8, 2021 and September 14, 2021, Motions Hearings, as well as, the Government and Defendant's exhibits presented in the present case.

The interviewers did not ask Defendant any questions of substance about the sexual assault during that initial conversation, and the entire substantive and material portion of the July 6, 2020, interview was recorded. (Tr. 59; see also Def.'s Exs. 4, 23).

At approximately 9:00 a.m., SA Montgomery and CI Dietman started the recording and began interviewing Defendant.[17] (Gov't's Ex. 1, at 00:00-00:28). At the outset of the interview, SA Montgomery informed Defendant of his rights as follows:

> You have the right to remain silent . . . Anything you say can and will be used against you in court. . . . You have the right to talk to a lawyer for advice before we ask you any questions. . . . You have the right to have a lawyer with you during questioning. . . .and if you cannot afford a lawyer one will be appointed for you at no charge . . . and if . . . we start talking now and you decide that you want to stop . . . you can stop anytime.

(Id. at 00:28-00:57). Defendant then responded, "I don't . . . I'm not very bright. My mom is usually my signer, my co-signer because . . . I don't know . . . how to spell or I don't know how to read." (Id. at 00:57-01:14). Defendant can be heard crying and stating, "I don't know . . . when I talked to my mom . . . she said . . . just don't say nothing" and "I don't know what's going on . . . I don't know what to say or do . . . that's all I'm trying to say." (Id. at 01:14-01:29). SA Montgomery then asked Defendant if he understood everything that was read to him to which Defendant responded, "Yes." (Id. at 01:29-01:32).

SA Montgomery asked Defendant if he had any questions about what was read to him, and Defendant asked, "I don't know why is this happening? I don't know why is this going on?" (Gov't's Ex. 1, at 01:32-01:44). SA Montgomery reminded Defendant of his arrest on July 3, 2020; that SA Montgomery was there to "get both sides of the story"; and that SA Montgomery was also there "to get a DNA swab" since Defendant had informed the Red Lake Police Department that he

---

[17] Government's Exhibit 1 is a thumb drive containing the audio recording of the July 3, 2020, interview of Defendant at the Red Lake Detention Center. At the September 8, 2021, Motions Hearing, the Government, without objection, offered the thumb drive audio recording into evidence as Government's Exhibit 1. (Tr. 59). The citations to the audio recordings are in a MM:SS format.

"would be willing to do that."  (Id. at 01:44-02:01).  Montgomery then informed Defendant that he could not give him legal advice and the decision to give a DNA swab was "up to [Defendant]." (Id. at 02:01-2:08).  CI Dietman stated, "It is totally your decision whether we do anything here today."  (Id. at 2:08-2:14).

Defendant then asked, "What do you want to hear from me?" and SA Montgomery responded, "I want to know what happened Friday, . . .  but before we get into it though, I have to have you sign this if you understand your rights" to which Defendant responded, "Ok." (Id. at 2:14-2:25).  SA Montgomery then asked, "Do you understand? . . .  I know you mentioned that you have trouble reading, but did you understand everything I told you?" to which Defendant responded, "Yeah." (Gov't's Ex. 1, at 2:25-2:37).  SA Montgomery then asked, "Do you have any questions . . . about your rights?" to which Defendant responded, "Yeah, about the whole . . . swab thing, what is that about?"  (Id. at 2:37-2:47). SA Montgomery then explained what the DNA swab would be used for.  (Id. at 2:47-3:00).  SA Montgomery then asked Defendant, "So you're willing to speak with us without a lawyer present right now . . . and like I said, if you want to stop you can stop at any time, it's up to you."  (Id. at 3:00-3:16).  Defendant responded, "Yeah . . . I'm in trouble anyways."  (Id. at 3:16-3:20).  Defendant was instructed to sign the FBI Advice of Rights form. (Gov't's Ex. 1, at 3:20-4:04; Gov't's Ex. 2).[18]

Defendant was then questioned about the alleged July 3, 2020, sexual assault, and the circumstances surrounding it.  (See Gov't's Ex. 1).  Defendant stated that he was riding his bicycle when he went to the victim's home on July 3, 2020; that he agreed to repair her air conditioning; that they were flirting and "things were going too far"; and that he left her house but returned to retrieve his phone.  (See, e.g., Id. at 14:44-14:56, 15:49-16:08).  Upon further questioning,

---

[18]  Government's Exhibit 2 is an FBI Advice of Rights form signed by Defendant.  At the September 8, 2021, Motions Hearing, the Government, without objection, offered the FBI Advice of Rights form into evidence as Government's Exhibit 2.  (Tr. 61).

Defendant admitted that he and the victim kissed, "but that's as far as it went"; that they did touch, "but that's about it"; and ultimately, that they had sexual relations. (Gov't's Ex. 1, at 15:49-16:28, 19:10, 22:14-22:57, 30:00-33:30). Defendant can be heard crying at various points throughout the recording showing concern about "losing [his] wife . . . [and] everything . . . over this stupid thing." (Id. at 15:50-16:06, 25:07-25:50, 30:41-30:54).   Defendant then inquired about, among other things, the consequences of his charges.  (Id. at 39:20-39:55).

Defendant was then asked to sign the FBI Consent to Search Form to obtain a swab of his DNA. (Gov't's Ex. 3).  Defendant continued to ask about his charges discussing the relationship with his mother and wife to which CI Dietman responded that his current tribal charge was for indecent liberties.  (Gov't's Ex. 1, at 41:29-42:49).  Defendant then asked, "But that's what I'm being charged with? . . . and this is why I'm taking a DNA swab, is because of that charge?  . . . Because I'm not too bright here, man, and I don't want to be fooled and I don't want to be tricked into getting in more trouble."  (Id. at 42:50-43:07).  SA Montgomery responded, "And that's why I was asking you if you had any questions about anything, did you understand everything, and did you have any questions."  (Id. at 42:51-43:17). Defendant's DNA swab was then collected.[19]  (Id. at 43:17-43:37).

The interview concluded at approximately 9:50 a.m. on July 6, 2020. (Id. at 49:49).

SA Montgomery and CI Dietman can be heard through the interview maintaining a conversational tone without raising their voices to yell or threaten Defendant. Likewise, Defendant maintained a conversational tone, and he was clearly cooperative and reasonably self-assured throughout the interview. CI Dietman testified at the September 8, 2021, Motions Hearing that Defendant appeared to understand SA Montgomery and his rights.  (Tr. 63).   Defendant asked

---

[19] Defendant's Exhibit 3 is an interview report of Defendant prepared by FBI Special Agent Justin Montgomery.  At the September 14, 2021, Motions Hearing, Defendant, without objection, offered the interview report into evidence as Defendant's Exhibit 4. (Tr. 19).

questions when he wanted and also responded appropriately to any questions presented. The investigators were not armed during the interview, and Defendant did not appear to be under the influence of any medications, drugs, or alcohol. (Tr. 55, 63-64).

### B.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966). Miranda warnings are thus required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

A defendant is entitled to a Miranda warning prior to custodial interrogation. Miranda, 384 U.S. at 444-45. Interrogation for Miranda purposes includes "any questioning or conduct that the government officer should know is reasonably likely to elicit an incriminating response." United States v. McLaughlin, 777 F.2d 388, 390 (8th Cir. 1985). Whether an incriminating response is sought by an officer is determined "from the perspective of the suspect" and not by the officer's actual intent. United States v. Richardson, 427 F.3d 1128, 1132 (8th Cir. 2005).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

### C. Analysis

Defendant contends that all his statements made during the July 6, 2020, interview were custodial and were not proceeded by a knowing and intelligent waiver of his <u>Miranda</u> rights. (Mem. in Supp., [Docket No. 70]). Defendant further contends that, any rights warning notwithstanding, his waiver and statements were in any event not voluntary under the circumstances. (<u>Id</u>.).

As noted above, <u>Miranda</u> warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" <u>Stansbury</u>, 511 U.S. at 322 (quoting <u>Miranda</u>, 384 U.S. at 444). To be subject to suppression under <u>Miranda</u>, a statement must be made while in custody and in response to interrogation. <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009) (citing <u>United States v. Londondio</u>, 420 F.3d 777, 783 (8th Cir. 2005)). A defendant may nevertheless waive his rights, "provided the waiver is made voluntarily, knowingly and intelligently." <u>Miranda</u>, 384 U.S. at 444.

It is undisputed that the questioning of Defendant during the July 6, 2020, interview constituted interrogation. (<u>See</u> Mem. in Supp. [Docket No. 70]; Mem. in Opp'n [Docket No. 73]). It is also undisputed that Defendant was being held at the Red Lake Detention Center, and therefore, was in custody during the July 6, 2020, interview. (<u>See</u> Mem. in Supp. [Docket No. 70]; Mem. in Opp'n [Docket No. 73]). The record clearly demonstrates that SA Montgomery advised Defendant of his <u>Miranda</u> rights at the outset of the interview and asked Defendant if he understood. (<u>See</u> Gov't's Ex. 1, at 0:00-3:20; Gov't's Ex. 2). After verbally acknowledging that he understood all his rights, Defendant agreed to answer SA Montgomery's questions and signed the FBI Advice of Rights form waiving his rights. (<u>See</u> Gov't's Ex. 1 at 0:00-3:20; Gov't's Ex. 2).

Accordingly, the only issues now before the Court regarding the July 6, 2020, interview is whether Defendant's waiver of his rights was made knowingly and intelligently, and whether his

waiver and subsequent statements were made voluntarily. See gen., Miranda, 384 U.S. at 444, 475. The validity of a Miranda waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

### 1. Voluntariness

Courts assess whether a waiver of rights pursuant to Miranda was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." United States v. Contreras, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver or confession was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-

determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

Defendant does not offer any specific argument that the investigators engaged in any specific coercive or intimidating tactics that caused his will to be overborn during the July 6, 2020, interview. Instead, Defendant contends his "diminished intellectual capacities" and his inability to read rendered his statements involuntary because he did not understand the consequences of his waiver. (See Mem. in Supp., [Docket No. 70]).

The Court's review of the totality of the circumstances shown in the present record does not indicate that Defendant's will was in any way overborn. Nothing in the present record indicates that the environment in which the interview occurred was inherently coercive. The interviewers were not armed during the interview, and Defendant did not appear to be under the influence of any medications, drugs, or alcohol. Further, the July 6, 2020, interview, which only lasted about fifty minutes, was not coercive in its duration. See United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (noting that interrogation lasting more than two hours was not coercive in duration).

In addition, the Court's independent review of the audio recording of the July 6, 2020, interview clearly and readily indicates that the investigators did not engage in threatening or coercive tactics. See Mims, 567 F. Supp. 2d at 1080 (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); see also United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant).

24

Throughout the interview, the interviewers maintained a conversational tone and made no threats or promises to Defendant to induce his rights waiver.

Further, the Court's review of the recording of the interview shows that Defendant spoke willingly, clearly, and non-defensively with the officers throughout.  Indeed, Defendant's conduct during the interview does not indicate that he was low functioning or particularly vulnerable— Defendant indicated that, among other things, he understood his rights; wanted to speak with the investigators; and was remorseful of the incident because he did not want to lose his wife.  While Defendant can be heard crying at various times throughout the interview, he clearly asked his own questions when he wanted, recounted the incident, and discussed his family.

To the extent Defendant argues that he was misled by SA Montgomery's "impl[ication] . . . that he was just there to talk and that it would be beneficial for [Defendant] to tell his side of the story," the Court does not find this deceptive.  Interview tactics utilized by government officers such as "claiming not to believe an explanation, making false promises, playing on a suspect's emotions, using [the suspect's] respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices" do not necessarily "render a confession involuntary." United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005).  Here, the victim had in fact been interviewed to obtain "her side of the story," and Defendant was not promised anything in exchange for his statement.

Lastly, Defendant's argument that his Miranda waiver was involuntary because SA Montgomery failed to read him the FBI Advice of Rights form, including the waiver section where he was instructed to sign, is unpersuasive.  Defendant was verbally advised of his Miranda rights and the consequences of any subsequent waiver.  Defendant was asked numerous times if he understood his rights to which Defendant acknowledged that he understood.  Defendant also agreed to speak with the investigators without an attorney present stating he was "in trouble

anyways." It was only after Defendant agreed to voluntarily speak and waive his rights that he was asked to sign the FBI Advice of Rights form.

Therefore, on the present record, the Court concludes that Defendant's waiver of his Miranda rights prior to the July 6, 2020, interview was voluntary.

### 2. Knowing and Intelligent

Next, the Court must consider whether Defendant's waiver of his rights prior to the interview on July 6, 2020, was knowingly and intelligently made. Vinton, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his rights and presence of mind during the July 6, 2020, interview consists of the audio recording of the interview and the hearing testimony of CI Dietman.

Defendant argues that his statements from the July 6, 2020, interview should be suppressed because the waiver of his rights under Miranda was invalid due to his inability to read the "Consent" section of the FBI Advice Rights form. (Mem. in Supp., [Docket No 70], at p. 4). Specifically, Defendant contends that his waiver cannot be deemed knowing and intelligent because he was not aware of the consequences of his waiver. (Id.). The Court disagrees.

On the present record, the Government offers sufficient evidence related to the July 6, 2020, interview for the Court to determine that Defendant's waiver of his Miranda rights at the outset of that interview was not only voluntary, but it was also knowingly and intelligently made. Defendant was verbally advised of his Miranda rights, to which Defendant acknowledged that he understood. Defendant was then asked if he would be willing to answer questions without an attorney, to which Defendant responded, "Yeah . . . I'm in trouble anyways." (3:20). Defendant was then asked to sign the FBI Advice of Rights form, which memorialized what Defendant had been verbally advised of. The signing of such a form "carries a significant weight in determining whether [Defendant's] waiver was knowing and intelligent." United States v. Gallardo, 495 F.3d

982, 991 (8th Cir. 2007) (citing North Carolina v. Butler, 441 U.S. 369, 373 (1979)). However, even without this, the Court finds that the verbal advisement of his Miranda rights and subsequent waiver given at the outset of the interview to Defendant by SA Montgomery fulfilled the requirements of Miranda. See 384 U.S. at 444; see also Butler, 441 U.S. at 473 (holding that a written waiver of rights pursuant to Miranda is not required and a defendant's "understanding of his rights and a course of conduct indicating waiver" may be sufficient evidence that the defendant has waived his right to remain silent); United States v. Binion, 570 F.3d 1034, 1041 (holding that defendant who refused to sign a written Miranda waiver nonetheless knowingly and intelligently waived his Miranda rights by volunteering incriminating information after being advised of his rights).

Moreover, nothing in the present record indicates that Defendant displayed any signs of confusion or the inability to understand his rights. To the contrary, Defendant talked openly and clearly for the duration of the interview. Defendant provided appropriate and responsive answers to the questions posed. Defendant never declined to answer questions or otherwise indicated that he no longer wished to talk. Any questions posed by Defendant were related to the collection of his DNA, the charges he was facing, and whether the victim corroborated his version of events. And there is no indication in the present record that Defendant was under the influence of drugs or alcohol or otherwise impaired in anyway such that he would have been unable to understand his rights.

Therefore, under the totality of the circumstances, the Court concludes that Defendant's waiver of his Miranda rights at the outset of the July 6, 2020, interview was knowing and intelligent.

Accordingly, this Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 26], be **DENIED**.

**X.     Defendant's Motion to Suppress Tribal Plea Agreement. [Docket No. 27].**

Defendant moves the Court for an Order suppressing the tribal court plea agreement arguing that: 1) Defendant was not afforded due process rights by the Red Lake Nation when he entered into the plea agreement and pled guilty; and 2) Defendant's due process rights were violated when the Government "colluded" with Red Lake law enforcement to secure Defendant's tribal court conviction. (See Def.'s Mem., [Docket No. 71], at pp. 4-9).

**A.  Statement of Facts**

The record presently before the Court indicates that, on July 9, 2020, Defendant appeared in the Red Lake Tribal Court for an arraignment with his defense attorney. (Def.'s Ex. 20). The audio recording of the arraignment captured the court being called to order and Red Lake Tribal Court Judge Allery being introduced. (Gov't's Ex. 5, at 0:00-0:05). Tribal Judge Allery then called Defendant's case and asked, "Mr. Begay, do you need me to read you your rights at this time or do you understand your rights? You understand? Ok. Alright." (Id. at 0:05-0:22). Defendant is not heard making any statements in the recording.[20] Tribal Judge Allery then turned his attention to defense counsel asking, "Mr. Johnson, are you representing Mr. Begay?" at which time defense counsel responded, "Ah, yes, Your Honor." (Id. at 0:22-0:31). Defense counsel then entered a plea of not guilty for Defendant. (Id. at 0:31-1:18). After Defendant's next hearing is scheduled, the prosecution and defense counsel argued bail conditions, at which time Tribal Judge Allery concluded the hearing ordering "a no-contact order with the alleged victim" and that Defendant "be held." (Gov't's Ex. 5, at 1:18-4:00). The hearing lasted for approximately four minutes. (Id.).

---

[20] The quality of the tribal court hearing recordings is sometimes depressed, and the fact that Defendant cannot always be heard should not be assumed to mean that he did not respond to the tribal judge either verbally or some form of non-verbal gesture.

Defendant subsequently appeared for a pre-trial hearing at Red Lake Tribal Court with his defense attorney on August 6, 2020. (Def.'s Ex. 20). The audio begins with Red Lake Tribal Court Judge Ringhand calling Defendant's case. (Gov't's Ex. 6, at 0:00-0:27). Defense counsel is heard informing the Court that Defendant is "maintain[ing] his not guilty [plea] and requests a trial by jury." (Id. at 0:27-0:30). Tribal Judge Ringhand then provides, "Ok, we'll have a jury trial on October 20th at 9 am, disclosures ordered seven days prior to trial. Mr. Begay, are you maintaining you're not guilty?" (Id. at 0:30-1:23). Defendant is not heard making any statements in the recording.[21] The prosecution and defense counsel then argue bail conditions, at which time Tribal Judge Ringhand concludes the hearing ordering that Defendant continue being held and the "no contact [order] to remain in place prior to trial." (Id. at 1:23-2:30). The hearing lasted for approximately two minutes and thirty seconds.

The record here next indicates that, on February 8, 2021, Defendant and the Red Lake Nation Prosecutor signed a "Proposed Plea Agreement," which provided, among other things, that Defendant was agreeing to enter into a plea of guilty to the charges of: "aggravated sexual assault 508.07(a) and breaking and entering 509.08." (See Gov't's. Ex. 4). The plea agreement also provided, among other things, that the Red Lake Nation proposed a recommendation of "[t]hree hundred and sixty-five days in jail imposed"; and "[p]rosecution makes no objection to any credit for time served." (Id.). Lastly, the plea agreement provided that "[t]he Defendant, freely and of his own accord, accepts the plea agreement above." (Id.).

A few days later, on February 12, 2021, Defendant appeared again with his defense counsel in tribal court for a change of plea hearing. (Def.'s Ex. 20). The audio begins with defense counsel stating, "When Angelica did the math, she said that she gave me the agreement. . . 15 days?"

---

[21] Id.

(Gov't's Ex. 7, at 0:00-0:07).[22]  The prosecutor is then heard saying, "15 days? Yeah, I didn't do

the math before court, Sonny. I just grabbed the file from Angelica basically, so sorry about that."

(Id. at 0:07-0:17).  Red Lake Nation Tribal Judge Allery then states

> Alright, so 365 days will be imposed.  Compliance with registering with the sex
> offender registry under the Red Lake Tribal Court provisions, the relevant ones.
> Defendant shall undergo a sex offender treatment program consistent with a
> psychological examination recommendation . . . Defendant shall have no contact
> with [the victim] in any manner, that means social media or any third-party contact.
> That's for sixty days following release.  And It sounds like there is quite a few time
> served here as well, so whatever that brings you to as far as time. They'll have a
> calculation of that back there.  It sounds like you got a little bit left but you're right
> at the end of it, right?

(Id. at 1:08-1:52).  Defendant can be heard to reply, "Yeah." (Id. at 1:52-1:53).  Tribal Judge Allery

then concludes the hearing stating, "Alright, I think that's everything."  (Id. at 1:53-2:04).  The

hearing recording operated  for approximately two minutes and four seconds.  (Id.).

Tribal Judge Allery also signed the "Proposed Plea Agreement," and prepared a court order

providing that Defendant appeared for a plea hearing with his defense counsel and the prosecutor

and has been ordered to, among other things, "be committed to 365 days in jail" and "credit time

served."  (See Gov't's Ex. 4).

**B.  Standard of Review**

Tribal court proceedings are governed by the Indian Rights Act of 1968 ("ICRA"), 25

U.S.C. § 1301 et seq. Bryant, 136 S. Ct. at 1958-59.  Through the ICRA, "Congress accorded a

range of procedural safeguards to tribal-court defendants 'similar, but not identical, to those

contained in the Bill of Rights and the Fourteenth Amendment.'" Id. at 1962 (quoting Santa Clara

Pueblo v. Martinez, 436 U.S. 49, 57 (1978)).  Among other safeguards, the ICRA requires tribes

---

[22] Government's Exhibit 7 is a thumb drive containing the audio recording of Defendant's February 12, 2021, change of plea hearing in Red Lake Tribal Court.  At the September 14, 2021, Motions Hearing, the thumb drive audio recording was admitted into evidence as Government's Exhibit 7, without objection.  (Tr. 4).  The citations to the audio recordings are in a MM:SS format.

to ensure "due process of law." 25 U.S.C. § 1302(a)(8). The Supreme Court has held that the safeguards of ICRA are sufficient to ensure that tribal court convictions are reliable. Bryant, 136 S. Ct. at 1966. Therefore, a tribal court conviction obtained in compliance with the ICRA may be used in federal court without violating the defendant's right to due process. Id.; see also United States v. Gillette, No. 3:17-CR-30122-RAL, 2018 WL 1446410, at *4 (D.S.D. Mar. 23, 2018).

### C. Analysis

Defendant first argues that the Court should suppress his tribal court conviction because the conditions of his imprisonment and the tribal court procedures in which his guilty plea was obtained failed to comport with the IRCA's guarantee of due process. (See Def.'s Mem., [Docket No. 71], at p 4). Specifically, Defendant asserts that, at the time of his plea hearing, he had been imprisoned for eight months and had only received two hearings—an arraignment and a pre-trial hearing—all of which lasted a combined six and half minutes. (Id. at p 5). Defendant also asserts that, during his plea hearing, which lasted two minutes and four seconds, the tribal court failed to comply with the Red Lake Tribal Code, which required that Defendant be advised of his rights and required the tribal court to ensure that Defendant's plea was knowing and voluntary.

As an initial matter, a review of the audio recording of Defendant's plea hearing reveals that the recording begins well into the proceedings on the record. As opposed to the audio recordings of Defendant's arraignment and pre-trial hearing, the tribal judge in Defendant's plea hearing is never announced, the case is never called, and the audio clearly begins with a colloquy between the prosecutor and defense counsel regarding a calculation of time. While the audio spans two minutes and four seconds, it is apparent that the hearing lasted longer in duration. The Court finds that this technical deficiency was, at most, harmless error. Therefore, to the extent Defendant argues that his purported two-minute plea hearing in and of itself violated his rights to due process, this is unsupported by the record.

As to Defendant's argument that the tribal court failed to comply with the Red Lake Tribal Code, this is predicated on assumptions that this Court cannot make.  Specifically, as Defendant asserts, before pleading to any criminal charge, the tribal judge is required to:

> a) read the complaint to the defendant and determine that the defendant understands the complaint and the section of the Tribal Code which the defendant is charged with violating, including the maximum authorized penalty; and b)        advise the defendant that he has the right: 1) to remain silent and that anything he does say may be used against him/her in this or in any subsequent proceedings; 2) that he has a right to counsel, at his own expense, in all subsequent proceedings; and if he/she cannot afford the services of counsel then one will be appointed for him/her[;] 3) that he has a right to talk with his counsel and a continuance will be granted if necessary to enable the defendant to obtain or speak to his counsel; [and] 4) that he has a right to a jury trial or a trial by the Court.

Red Lake Tribal Code Chapter 404.04, subd. 4.  The tribal judge would have also been required to only accept Defendant's guilty plea if "he is satisfied that the plea is made voluntarily and the defendant underst[ood] the consequences of the plea."  Red Lake Tribal Code Chapter 404.01, subd. 8.  However, Defendant fails to provide affirmative evidence to conclusively verify that the tribal judge did not comply with these relevant tribal codes during the plea hearing.  Such ambiguity or silence in the record is insufficient to establish that Defendant's due process rights were violated during the tribal proceedings and in entering a guilty plea.[23]

Furthermore, Defendant relies on United States v. Bundy, 966 F. Supp. 2d 1175, 1180 (D.N.M. 2013) to argue that Defendant's guilty plea should be suppressed because the tribal court failed to advise Defendant of his rights.  In Bundy, the District of New Mexico court found that, despite the Navajo Rules of Criminal Procedure requiring the tribal judge to explain to the defendant her rights before accepting her plea, a review of the court transcript showed "a cursory, rudimentary colloquy. . . the transcript [did] not include any enumeration of those rights nor [did]

---

[23] It is Defendant—not the Government—who has the burden to show by a preponderance of evidence that his prior convictions are constitutionally invalid through affirmative evidence.  United States v. Miller, No. 13-CR-1867 WJ, 2014 WL 12796762, at *4 (D.N.M. Apr. 11, 2014).

the record show that Defendant was told that she was giving up those rights by pleading guilty," instead, the defendant was asked, "Do you understand your rights as explained to you?" <u>Bundy</u>, 966 F. Supp. 2d 1171. However, <u>Bundy</u> is distinguishable from the present case. First, Defendant here had the assistance of counsel throughout his tribal proceedings (including the plea hearing) whereas the defendant in <u>Bundy</u> did not. Second, court audio relied on in this case suffered from technical deficiencies in that the entirety of the plea hearing was not recorded whereas there is no indication in the <u>Bundy</u> case that the court transcript was incomplete. Therefore, the Court declines to follow it.

The Court finds <u>United States v. Gillette</u>, 17-CR-30122-RAL, 2018 WL 1446410, at *1 (D.S.D. Mar. 23, 2018), more persuasive. The defendant in <u>Gillette</u> sought to suppress his tribal court guilty plea on the grounds that he was never provided a factual basis for his plea, the complaint was not read to him in open court, and the tribal judge did not advise him of his rights. <u>Gillette</u>, 2018 WL 1446410, at *3. While the <u>Gillette</u> court had the benefit of the full audio recording of the defendant's plea hearing to determine that his guilty plea complied with the ICRA and tribal law, <u>Id.</u> at *4 ("Gillette confirmed that he understood the tribal criminal complaint and that his guilty plea was voluntary. . . the tribal judge listed each charge, along with the corresponding docket number, and asked Gillette what his plea was to those charges."), the <u>Gillette</u> court also found it reasonable to presume that the defendant understood the nature of the crime he pled to in tribal court because, among other things, he was represented by counsel. <u>Id.</u> at *5.

Here, like the defendant in <u>Gillette</u>, Defendant was represented by counsel throughout his tribal court proceedings and there is no indication nor argument that counsel was ineffective during Defendant's tribal proceedings—i.e., whether defense counsel failed to inform Defendant of the consequences of entering into the plea agreement. <u>See generally</u>, <u>Strickland v. Washington</u>, 466 U.S. 687-88 (providing that the defendant must show that his counsel's performance fell below an

objective standard of reasonableness and that there is no reasonable probability that, but for his counsel's errors, the result of his proceeding would have been different).

Therefore, even if the tribal judge had failed to advise Defendant of his rights or to determine whether the plea was entered into knowing and voluntarily, any error committed in the tribal court proceedings were cured by the assistance and advice of counsel.[24]  The Court will therefore assume that Defendant was informed of his rights by counsel.  See e.g., Gillette, 2018 WL 1446410, at *5; but see, Bundy, 966 F. Supp. 2d at 1179 ("[s]ince there is no indication in the transcript that Defendant was represented by counsel, the Court will not assume that Defendant was informed of her rights by counsel.").  Indeed, if there had been an error in the plea hearing, defense counsel would have made appropriate objections, which would have been captured in some of the available plea hearing audio; in the absence of such objections, the Court concludes that the plea hearing did not contain constitutional errors.

Lastly, even if the Red Lake tribal court committed a procedural error during Defendant's tribal proceeding under the tribal code, any challenge to these procedures resides in the purview of the Red Lake Nation.  It is well established that the Red Lake Nation acts as a separate sovereign when it prosecutes its own members for crimes not preempted by Congress.  See United States v. Wheeler, 435 U.S. 313, 323-27 (1978).  Therefore, but for challenges to Defendant's subsequent federal prosecution under the dual-sovereignty exception, this Court does not have jurisdiction to challenge the Red Lake tribal court's procedures in Defendant's tribal prosecution.  See Martin v. United States, 2017 WL 976928, at *6 (D. Minn. Mar. 13, 2017) (holding that a federal court has

---

[24] Indeed, having representation throughout the tribal court proceedings goes beyond the requirements imposed by the ICRA.  § 1302(6).  Under the ICRA, tribes are only required to provide counsel for indigent defendants when a sentence of more than one year is imposed. 25 U.S.C. § 1302(c)(2) (emphasis added). In all other circumstances, defendants may hire an attorney to represent them but must do so at their own expense. 25 U.S.C. § 1302(a)(6). Here, Defendant was facing a maximum sentence of no more than 365 days.  Therefore, by receiving representation, Defendant had more protection during his tribal proceedings than what was mandated under ICRA.

no authority to order the Red Lake Band of Chippewa Indians or the Red Lake Tribal Court to comply with its order or to otherwise act, and whether the defendant decides to pursue remedies in the Tribal Court with respect to issues relating to his tribal court convictions is not before the federal court).

Defendant next argues that his due process rights were violated when the Government purportedly colluded with Red Lake law enforcement. "While there may be circumstances in which the conduct of law enforcement agents is so outrageous that due process bars the government from invoking the judicial process to obtain a conviction, the level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." United States v. King, 351 F.3d 859, 867 (8th Cir. 2003) (internal quotation marks and citations omitted). "This defense is reserved for conduct that falls 'within that narrow band of the most intolerable government conduct.'" Id. (quoting United States v. Pardue, 983 F.2d 843, 847 (8th Cir. 1993)).

Here, on the record provided and as discussed in section VIII, supra, there is no credible evidence that the Government used Red Lake law enforcement or the Red Lake prosecutor as a "mere tool" when the Red Lake Nation prosecuted Defendant. Defendant's speculative and conclusory allegations merely focuses on typical and routine cooperation between Red Lake law enforcement and the Government—there is no evidence of collusion. See e.g., Williams, 104 F.3d at 216 (8th Cir. 1997) (recognizing that cooperation between state and federal authorities does not amount to unlawful collusion."). Indeed, "cooperation between federal and state officials not only do not offend the Constitution but are commonplace and welcome." United States v. Leathers, 354 F.3d 955, 960 (8th Cir. 2004). Further, Defendant's assertion that the FBI investigation "had been functionally dormant for nearly half a year" while Defendant remained incarcerated in tribal jail, but then "without any apparent explanation," became active five days after Defendant entered a

guilty plea is not supported by the record. Pending DNA status reports generated by BCA and sent to SA Montgomery in November 2020, January 2021, and February 2021 establishes that the FBI's investigation was very much active. Specifically, these reports were advising that certain items would be forensically examined against a DNA sample collected in July 2020. It was not until March 2021 that the BCA submitted its final DNA report confirming Defendant's DNA against said sample.

Therefore, in the absence of any evidence of any actual improper collusion between federal and tribal authorities, the tribal court prosecution "cannot be said to so offend a fundamental principle of justice as to rise to the level of outrageousness needed to support a due-process violation." United States v. Stately, 19-CR-342 (ECT/LIB), 2021 WL 1187152, at *5 (D. Minn. Mar. 30, 2021); see also King, 351 F.3d at 867.

Accordingly, the undersigned recommends that Defendant's Motion to Suppress Tribal Plea Agreement, [Docket No. 27], be **DENIED**.

## XI.    Conclusion

Thus, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. The Government's Motion for Discovery, [Docket No. 16], is **GRANTED**, as set forth above;

2. Defendant's Motion to Retain Rough Notes, [Docket No. 18], is **GRANTED**, as set forth above;

3. Defendant's Motion to Compel Production of Giglio Material, [Docket No. 19], is **GRANTED**, in part, and **DENIED** without prejudice, in part, **as** set forth above;

4. Defendant's Motion for Disclosure of 404(b) "Bad Acts" Evidence, [Docket No. 20], is **GRANTED**, as set forth above;

5. Defendant's Motion for Pretrial Disclosure of Jencks Act Materials, [Docket No. 22], is **DENIED**, as set forth above;

6. Defendant's Motion for Release of <u>Brady</u> Materials, [Docket No. 23], is **GRANTED**, as set forth above;

7. Defendant's Motion for Discovery and Inspection, [Docket No. 25], is **GRANTED**, as set forth above; and

8. Defendant's Motion to Compel Production of Communications Among Members of the Prosecution Team, [Docket No. 38], is **DENIED**, as set forth above.

Further, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant's Motion to Suppress Statements, [Docket No. 26], be **DENIED**; and

2. Defendant's Motion to Suppress Tribal Court Plea Agreement, [Docket No. 27], be **DENIED**.

Dated: January 6, 2022                    <u>s/Leo I. Brisbois</u>
                                          Hon. Leo I. Brisbois
                                          U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.